

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

JAMES WRIGHT and
SUSAN WRIGHT,

        Appellant,

v.

KEVIN BEDLINGTON and
JANE DOE BEDLINGTON,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 69800-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: March 24, 2014

SPEARMAN, A.C.J. — James and Susan Wright sued Kevin Bedlington and his spouse for a "whiplash" injury caused by a motor vehicle accident in which Mr. Bedlington rear-ended Mr. Wright. The Bedlingtons conceded liability and the Wrights' claims for damages were tried to a jury. Mr. Wright sought $185,000 in special and general damages and his wife sought $45,000 for loss of consortium. The Bedlingtons asked the jury to award Wright medical expenses of $3,950.50 and $4,250 in general damages, a total of $8,200.50. The jury awarded the amount suggested by the Bedlingtons. The Wrights moved for a new trial on grounds that the evidence was insufficient to support the verdict and the award was so "inadequate as unmistakably to

indicate that the verdict must have been the result of passion or prejudice."[1] CR

59(a)(5)(7), RCW 4.76.030. The trial court denied the motion and the Wrights appealed.

We affirm.

## FACTS

On May 27, 2009, James Wright was rear-ended while driving his Toyota Land

Cruiser. The other driver, Kevin Bedlington, had been going approximately 25 miles per

hour and admittedly failed to stop in time to avoid hitting the rear of Mr. Wright's vehicle,

which was stopped in traffic.

Mr. Wright went to the emergency room after the accident. Within an hour or so,

he walked out of the emergency room; his wife drove him back to the accident scene

and Mr. Wright drove the Land Cruiser home. The next day, Mr. Wright, who is a trial

lawyer, went to his office and worked a half day; he put in a short day, on the following

day, a Friday. Mr. Wright was back at work, putting in "pretty ordinary or regular

business hours" on the following Monday. Verbatim Report of Proceedings (VRP) at 98-

99. On June 10, 2009, approximately two weeks after the accident, Mr. Wright saw his

longtime family physician, Dr. Dickson, regarding some lingering tenderness at the back

of his neck. During the exam, Mr. Wright related experiencing temporary pains in areas

other than the neck immediately following the accident; however, he informed Dr.

---

[1] Alternatively, the Wrights also moved to increase the verdict to $90,000 and $10,000, respectively for Mr. and Ms. Wright under RCW 4.76.030. However, the statute provides that the court may only grant a motion to increase or decrease the verdict if it first determines that a new trial is warranted and then only if the party adversely affected consents to the modification. Here, even if the trial court had been inclined to grant the motion for a new trial, there is no indication in the record of the Bedlingtons' consent to increase the verdict. Thus, the trial court had no authority to grant the motion. Green v. McAllister, 103 Wn. App. 452, 462, 14 P.3d 795 (2000). Accordingly, we do not address the Wrights' alternative motion in our consideration of this appeal.

Dickson that these pains had already dissipated. Mr. Wright denied experiencing any weakness, numbness, headaches, or dizziness following the accident. When Dr. Dickson examined Mr. Wright, he found no irregularities. Dr. Dickson did note residual tenderness at the "posterior aspect of [the] C7" vertebra. VRP at 184. Dr. Dickson concluded that Mr. Wright had "mild residual symptoms that were mild in nature" from the accident and expected he would "fully recover". VRP at 187. Given the mild nature of Mr. Wright's complaints and Dr. Dickson's findings on examination, Dr. Dickson did not feel prescription medications were necessary. He suggested that Mr. Wright take over the counter medication for any pain and suggested a follow up visit in 30 days.

Approximately two months later, on August 19, 2009, Mr. Wright returned to Dr. Dickson. At that time he complained about a pain at the back of his neck. Mr. Wright reported improvement in both range of motion and general discomfort. Dr. Dickson diagnosed a "cervical strain" and told Mr. Wright to return as needed. Dr. Dickson also referred Mr. Wright to Dr. Goldman, a board certified neurosurgeon.

Dr. Dickson did not treat Mr. Wright again until March 19, 2010, when Mr. Wright sought treatment for flu-like symptoms that appeared to be caused by a viral or bacterial infection.[2] Dr. Dickson prescribed an antibiotic and never treated Mr. Wright after this visit.

On Dr. Dickson's referral, Mr. Wright saw Dr. Goldman in October 2009 and again in December 2009. Dr. Goldman did not testify at trial, but his reports and records were admitted into evidence. Mr. Wright initially complained to Dr. Goldman of neck

---

[2] Mr. Wright's treating neurologist, Dr. Baker, later observed that this infection could have been a precursor to the brachial plexus neuritis that caused Mr. Wright's hospitalization only ten days later.

pain, headaches and generalized ache in his upper extremities. Exhibit 4. Mr. Wright

filled out a Magnetic Resonance Imaging (MRI) screening questionnaire in connection

with Dr. Goldman's treatment that asked him to show, on an outline of the human body,

where his problems were located. He placed a single "X" at the base of the back of the

neck. Exhibit 8. Dr. Goldman diagnosed Mr. Wright with a traumatic disc herniation at

the C5-6 vertebrae, which Dr. Goldman opined was the result of trauma sustained in the

2009 auto accident.[3] Exhibit 5.

Dr. Goldman also determined that Mr. Wright was having a "good response to

conservative management . . . ." Exhibit 5. His pain was less severe and the diffuse

aches in his arms were lessening, though he had occasional episodes of paresthesia[4] in

the arms. Given his positive response to treatment, Mr. Wright was instructed to

continue with neck exercises and return only if he "ha[d] a progression of symptoms and

want[ed] to be re-evaluated . . . ." Exhibit 5. Mr. Wright did not seek further medical

treatment related to the accident until late March of 2010, approximately three months

after his last visit to Dr. Goldman.

Dr. Dean Shibata is a board certified neuroradiologist and an associate professor

at the University of Washington who specializes in interpreting MRI and Computerized

Tomography (CT) scans of the brain, neck and spine. At the request of the Bedlingtons,

Dr. Shibata reviewed an x-ray and a number of MRI scans of Mr. Wright in preparation

---

[3] Dr. Goldman diagnosed the bulging C5-6 disc based on review of an MRI scan. Later, Dr. Shibata, a neuroradiologist, reviewed the scans and concluded that the bulging disc was the result of age-related degenerative changes as opposed to trauma and was not related to the accident.

[4] A sensation of pricking, tingling, or creeping on the skin that has no objective cause and usually associated with injury or irritation of a sensory nerve or nerve root. WEBSTER THIRD INTERNATIONAL DICTIONARY 1641 (2002).

for trial. According to Dr. Shibata, the records disclosed bony changes to the C5-6 region of Mr. Wright's spine; he concluded that these changes were indicative of age-related degeneration as opposed to trauma. Dr. Shibata testified that he was "confident the bony changes didn't occur over weeks or even months. They're changes that occurred over years." VRP at 305.

Dr. Shibata also testified that, while he did not see specific evidence of a "whiplash soft tissue injury," that is something that could neither be confirmed nor excluded based on the records before him. VRP at 309. However, he opined that such an injury would not have caused the herniated C5-6 disc, given the bony changes evident in the imaging, which could only have occurred over a significant period of time. VRP at 298, 302-09. Further, he concluded that the herniated disc was most likely asymptomatic. VRP at 298, 302-07.

On March 29, 2010—ten months after the auto accident and three months after Mr. Wright's last medical appointment for accident-related injuries—Mr. Wright was having dinner with family when he began to experience severe pain in his neck, shoulders, and down his left and right arms. "[T]he amount of pain kept ratcheting up and up and up." VRP at 108. Mr. Wright was in such severe pain that he believed he would die. That night, he went to the emergency room for treatment.

Mr. Wright spent three days in the hospital. During that time, he experienced "unique severe pain." VRP at 173. At one point, the pain was so severe that he lost consciousness. During his hospital stay, Mr. Wright was treated by Dr. Baker, the neurosurgeon on call when he was admitted to the hospital. Dr. Baker testified via video

deposition that he diagnosed Mr. Wright with "acute idiopathic brachial plexitis," a condition of unknown origin, which causes sudden inflammation of the bundle of nerves stemming from the spine down under the clavicle into the arms. After he was released from the hospital, Mr. Wright sought second opinions from two neurologists, Drs. Mackay and Mayadev. Both confirmed the diagnosis of brachial plexus neuritis (BPN).[5]

At trial, Mr. Wright recalled that he was out of the office for "two complete weeks" following the onset of BPN. Ms. Wright testified that he was "mostly at home" in the two months following his hospitalization; that "he was having severe pain," and that he was having difficulty eating, sleeping or "[d]oing much at all." VRP at 174. As a result, Ms. Wright took time off from work to care for her husband. Ms. Wright has observed that, since his hospitalization on March 29, 2010, Mr. Wright has had ongoing "nerve pain" in his hands, forearms, shoulders and upper arms. This nerve pain affects "his arms and strength" and limits his activities. VRP at 176.

Virginia Sullivan, Mr. Wright's mother-in-law; Chris Haugen, Chief of Police for Sumas, Washington and an acquaintance of Mr. Wright; Joye Marie Crabtree and Jayna Cassavant, coworkers of Mr. Wright, each testified that following the May 2009 accident, Mr. Wright appeared to be in pain, exhibited symptoms of headache, neck ache, and was unable to lift his arms high or carry heavy loads. These witnesses were not asked to and did not draw a distinction between Mr. Wright's symptoms before and after the onset of BPN.

---

[5] The parties and their experts use the terms "acute idiopathic brachial plexitis" and "brachial plexus neuritis" interchangeably. See e.g., CP at 127-31, 140; VRP at 116, 123-26, 174; Brief of Respondent at 9-10.

Dr. Baker testified that Mr. Wright told him that his problems from the car accident had been largely resolved before the onset of BPN on March 29, 2010. Further, Dr. Baker explained that, in his opinion, the car accident was unrelated to the onset of BPN. His opinion was based on Mr. Wright's reported improvement of his symptoms after the accident with conservative measures like "physical therapy, time and anti-inflammatory medications," and on his review of Mr. Wright's MRI. CP at 126-31. Dr. Baker also testified that close to 40 percent of patients who suffer from BPN remain symptomatic after a bout with the disease. Specifically, he stated that they could be left with chronic neuropathic pain, weakness, and numbness—symptoms identical to those complained of by Mr. Wright.

Dr. Frederick Braun, a neurologist, also testified on behalf of the Wrights. Mr. Wright saw Dr. Braun in August 2010 and again in September 2012 on referral by his attorneys for "independent medical exams." VRP at 216-17. Dr. Braun testified that as part of the exam procedure, he had Mr. Wright prepare and sign a sketch of the human body, similar to the one Mr. Wright had prepared for Dr. Goldman in 2009. This time, instead of placing a single "X" at the base of the back of his neck to indicate the area that was causing him pain and concern, Mr. Wright drew in dozens of marks to indicate pain extending over the front and back of his shoulders, his upper back and collar bone, and radiating up and down the front and back of both arms.

In mid-March 2012, Mr. Wright sought treatment from a physical therapist. The therapist's notes, which were contained in Dr. Braun's notes regarding Mr. Wright, stated the reported "date of onset" of Mr. Wright's symptoms was "[t]wo years ago."

VRP at 287. Dr. Braun confirmed that this notation meant March 2010—the time of Mr. Wright's hospitalization for BPN.

Dr. Braun also testified that the symptoms of which Mr. Wright complained are commonly associated with BPN. He further testified that the disease is of "[u]ndetermined etiology" and that he found no link between the occurrence of the disease in Mr. Wright's case and the May 2009 auto accident. VRP at 233, 252-56. He also confirmed that "ninety to ninety-five percent of people with neck injuries" of the sort Mr. Wright reported after the auto accident "do heal within three to six months," although he maintained that Mr. Wright was in the "five to ten percent category" of people who do not. VRP 289.

During closing argument, the Wrights asked the jury to return verdicts of $185,000 on Mr. Wright's claims and $45,000 for Ms. Wright's loss of consortium claim. The Bedlingtons argued that because Mr. Wright ended treatment for injuries associated with the auto accident in December 2009, he was entitled to no more than reimbursement for medical bills incurred and pain and suffering endured up to that time. They urged the jury to award $3,950.50, and, $4,250, respectively—a total of $8,200.50. The Bedlingtons made no proposal regarding Ms. Wright's loss of consortium claim.

The jury returned a verdict for the plaintiffs in the amount of $8200.50 for Mr. Wright and nothing for Ms. Wright. The Wrights moved for a new trial pursuant to CR 59 and RCW 4.76.030. The trial court denied the motion. The Wrights appeal the verdict and the trial court's denial of their motion.

DISCUSSION

The Wrights maintain the trial court erred when it denied their motion for a new trial because the evidence is insufficient to support the verdict and because the verdict was so "inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice." CR 59(a)(5). We affirm.

Sufficiency of the Evidence

On motion of an aggrieved party, a verdict may be vacated and a new trial granted where "there is no evidence or reasonable inference from the evidence to justify the verdict . . . ." CR 59(a)(7). We review the denial of such a motion for abuse of discretion. An abuse of discretion occurs when a decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006). In evaluating whether substantial evidence supports the jury's verdict, we view the evidence in the light most favorable to the nonmoving party. Herriman v. May, 142 Wn. App. 226, 232, 174 P.3d 156 (2007). The law gives a strong presumption of adequacy to the verdict. Cox v. Charles Wright Academy, Inc., 70 Wn.2d 173, 176, 422 P.2d 515 (1967). A trial court has no discretion to disturb a verdict that is within the range of evidence. Herriman, 142 Wn. App. at 232.

The Wrights contend that undisputed evidence shows the May 2009 auto accident caused Mr. Wright significant pain and the disruption of his family life from the date of the accident through the date of trial. They also contend there was no evidence, aside from statistics on recovery rates that Mr. Wright's ongoing symptoms were caused by his BPN. Accordingly, they argue the jury's verdict, which appears to have concluded

9

that most, if not all, of Mr. Wright's injuries from the accident were resolved before the onset of BPN, is unsupported by any evidence. Further, they assert that because the damage award is lower than the minimum amount supported by the evidence, the trial court erred when it denied the motion for a new trial. We reject each of these contentions.

The Wrights correctly argue that it was undisputed at trial that Mr. Wright suffered an injury caused by the accident with Mr. Bedlington. But there was significant dispute about whether Mr. Wright had largely recovered from the injury caused by the accident before the onset of BPN and about the cause of Mr. Wright's ongoing symptoms. Viewing the evidence in the light most favorable to the nonmoving party—here, the Bedlingtons—we conclude there was ample evidence from which the jury could have reasonably determined that the injury Mr. Wright sustained in the auto accident, was resolved by December 2009 and that any ongoing symptoms were caused by the onset of BPN.

Dr. Dickson, who treated Mr. Wright following the accident, testified that within two weeks of the accident, Mr. Wright reported that pain in areas other than the neck had already dissipated and he denied any weakness, numbness, headaches or dizziness. The doctor concluded that Mr. Wright had only mild residual symptoms from the accident and would fully recover.

Dr. Goldman, who examined Mr. Wright in October and December 2009, and whose treatment records were admitted at trial, reported that Mr. Wright was responding well to "conservative management." Exhibit 5. His pain was less, with only occasional

episodes of parethesia. There was also evidence that Mr. Wright sought no further medical attention for these symptoms until after the onset of BPN.

Dr. Baker, the neurologist on call when Mr. Wright was admitted to the hospital in late March 2010, and who first diagnosed Mr. Wright with BPN, testified that Mr. Wright reported that his symptoms from the car accident had been largely resolved before the onset of BPN. While he reported "some on-and-off problems with his neck," he was not having any radiating pain in his arms. CP at 131.

Furthermore, the symptoms described by Mr. Wright after the accident, were entirely different than those he described after developing BPN. Following the accident Mr. Wright missed only a few hours of work, his wife took no time off from work to care for him and he described no inability to perform his usual household duties. In contrast, following the onset of BPN, Mr. Wright missed at least two full weeks of work, Ms. Wright missed work to care for him and there was testimony about his inability to contribute around the house. In addition, when asked by Dr. Goldman, prior to the onset of BPN, to indicate where his problems were located on the outline of a human figure, he placed one "X" at the base of the neck. But when he was asked to do the same by Dr. Braun, after the onset of BPN, Mr. Wright drew dozens of marks to indicate pain extending over his shoulders, upper back, collarbone and up and down both arms. Moreover, Dr. Braun conceded that close to 40 percent of the victims of BPN suffer from the very same symptoms experienced by Mr. Wright since the onset of the disease in May 2010.

Finally, the testimony of Dr. Shibata directly contradicted Dr. Goldman's theory that the May 2009 accident caused the injury to Mr. Wright's spine. Dr. Shibata opined that, although Mr. Wright may have suffered some soft tissue injury from the accident, any deformity in Mr. Wright's spine was caused by age and was unrelated to the accident.

The Wrights point to the evidence supporting their theory of the case, and argue the favorable inferences to be drawn from that evidence. But the jury is the ultimate finder of fact. In reaching its verdict, it is the jury's duty to weigh all of the evidence, credit or discredit the testimony as it sees fit, and draw reasonable inferences from the evidence, while rejecting other possible inferences. James v. Robeck, 79 Wn.2d 864, 870, 490 P.2d 878 (1971). Because the evidence before the jury on how long Mr. Wright suffered from the effects of the auto accident and whether Ms. Wright suffered a loss of consortium was disputed, we will not, on appeal, disturb the jury's resolution of these issues. Davenport v. Taylor, 50 Wn.2d 370, 378, 311 P.2d 990 (1957).

### Adequacy of the Damage Award

The Wrights' also claim that the jury's damage award was so inadequate as unmistakably to indicate that the verdict must have been the result of passion or prejudice. Again, we disagree. The law gives a strong presumption of adequacy to the verdict. "'Regardless of the court's assessment of the damages, it may not, after a fair trial, substitute its conclusions for that of the jury on the amount of damages. When the evidence concerning injuries is conflicting, the jury decides whether the injuries are insignificant, minor, moderate, or serious, and it determines the amount of damages.'"

Bunch v. King County Dep't of Youth Services, 155 Wn.2d 165, 174, 116 P.3d 381 (2005) (quoting Cox, 70 Wn.2d at 176). If the verdict is reasonably within the range of proven damages then it cannot be found, based solely on the amount of the award that the verdict was unmistakably so excessive or inadequate as to show that the jury had been motivated by passion or prejudice. James, 79 Wn.2d 870-71.

The jury's damage award in this case was well within the range of the evidence. There was evidence showing that Mr. Wright's medical bills for treatment reasonably related to the accident from the date of the accident until he stopped treatment in December 2009 totaled $3950.50. If the jury concluded, as argued by the Bedlingtons, that Mr. Wright's injuries resulting from the accident were resolved around the time he stopped treatment and that Mr. Wright was also entitled to $4250 in general damages, the award of $8200.50 is consistent with the evidence before the jury.

Similarly, the award of no damages for Ms. Wright's loss of consortium claim is within the range of evidence. Prior to the onset of BPN, there was no evidence that Ms. Wright suffered any loss of consortium. According to their own testimony, following the accident, Mr. Wright left the emergency room, got in the accident vehicle and drove home. He went to work the next day and did not miss work, other than taking the time for a few visits to the doctor's office and physical therapy. Ms. Wright did not take time off from work to care for him or hire a third party to care for him. The jury may well have concluded that the quality of life for the Wrights did not change in any significant way during the six to seven months that Mr. Wright sought treatment for cervical strain after the accident. It is only after Mr. Wright was stricken with BPN that he missed substantial

time from work, was physically unable to do many things like helping around the house, and Ms. Wright had to miss work to care for him. If the jury concluded that the debilitating symptoms Mr. Wright complained of were caused by BPN and not the accident, then the decision to award no loss of consortium damages to Ms. Wright was well within the range of evidence.

The Wrights also argue that the jury's consideration of damages was prejudiced by one sentence of improper testimony. During pretrial motions the trial court granted the Wrights' motion to exclude evidence of Mr. Bedlington's personal history. Nonetheless, on direct examination, he testified:

> I worked in commercial lending for 12 years. And at this point I'm
> currently unemployed pursuing new employment in lending.

VRP at 330. The trial court sustained the Wrights' objection to the testimony and instructed the jury to disregard it. The Wrights did not move for a mistrial. They now argue that the verdict demonstrates the jury ignored the court's curative instruction and that Mr. Bedlington's improper testimony motivated the jury to make an inadequate damage award. The argument is without merit.

It is presumed, absent a contrary showing, that the jury followed the court's instruction to disregard the improper testimony. Dauphin v. Smith, 42 Wn. App. 491, 713 P.2d 116 (1986). Because, as previously discussed, there is substantial evidence to support the jury's damage award, the Wrights cannot show that the presumption should not apply in this case.

## CONCLUSION

The Wrights fail to demonstrate that the evidence was insufficient to support the verdict or that the damages awarded are so inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice. Accordingly, we conclude that the trial court did not abuse its discretion when it denied the Wrights' motion for a new trial.[6]

Affirm.

WE CONCUR:

_Spearman, A.C.J._

_Cox, J._

---

[6] The Wrights also cite the trial court's order denying the motion for new trial, which includes the statement, "[i]f the court had the power under the law ... to grant an additur it would do so." CP at 286; VRP at 412-413. They suggest this shows the court misperceived its authority to grant their motion. The statement merely recognizes, however, that where substantial evidence supports the jury's verdict and the damage award is within the range of evidence presented to the jury, the trial court has no authority, after a fair trial, to alter the jury's decision. James, 79 Wn.2d at 869. Thus, even though the trial court may have reached a different result, it recognized that, under the circumstances, it was bound by the jury's decision.